**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MIRIAM WEINBERG, | Civil Action No. 1:23-cv-10801 |
| Plaintiff, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| ARCH ASSET MANAGEMENT LLC, | |
| Defendant. | |

Plaintiff Miriam Weinberg, by and through her attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon personal knowledge and information and belief as to other matters as follows:

**NATURE OF ACTION**

1.      Plaintiff Miriam Weinberg ("Ms. Weinberg" or "Plaintiff") brings this action against Defendant Arch Asset Management LLC ("Defendant" or "Arch") for damages suffered because of Defendant's discriminatory acts in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000 *et seq.* ("Title VII"), the New York Human Rights Law, New York Statutes Executive Law, Art. 15, vol. 14, §§ 209-301 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, § 8-107 *et seq.* ("NYCHRL").

**PARTIES**

2.      Plaintiff Miriam Weinberg is a 28-year-old female. She is a resident of West Hempstead, New York, and a citizen of the state of New York.

3.      At all relevant times, Ms. Weinberg was an employee of Defendant Arch Asset Management LLC as defined by Title VII, the NYSHRL, and the NYCHRL.

4.      Defendant Arch Asset Management LLC is engaged in the business of investment advisory services and is headquartered at 88 University Place, 2nd Floor, New York, New York 10003 and is incorporated in Delaware.

5.      Defendant Arch was Ms. Weinberg's employer as defined by Title VII, the NYSHRL and the NYCHRL.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII. This Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PREREQUISITES

8.      Ms. Weinberg filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about March 9, 2023. On September 22, 2023, the EEOC issued a notice of a right to sue.

9.      A copy of the Complaint in this action has been served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

10.      Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

11.      Plaintiff Miriam Weinberg began working for Defendant Arch on July 28, 2022, as Property Controller.

12.     Ms. Weinberg was choosing between two offers before accepting the position with Arch. In an email chain, on or around June 27, 2022, Arch provided benefits like a flexible one-to-two-day work from home schedule to entice her to choose Arch.

13.     She was hired to replace Alex Yusupov, former Senior Property Accountant, whom the Defendant terminated upon hiring Ms. Weinberg.

14.     Although her employment offer contained the title Senior Property Accountant, and the responsibilities of the position were outlined under the same title, Ms. Weinberg suggested, and Defendant agreed to, a title change to Property Controller.

15.     Ms. Weinberg was a loyal and hard-working employee.

16.     When Ms. Weinberg started, she hit the ground running, regularly working fifty to fifty-seven hours per week.

17.     Though she chose to mostly work in-office, per an email from Ms. Bortko, Ms. Weinberg was allotted a couple days per week of working from home.

18.     During her tenure, Ms. Weinberg's responsibilities as Property Controller included tasks related to managing the company's finances.

19.     Ms. Weinberg was also required to take on tasks related to operations, including putting together trainings and handbooks.

20.     Ms. Weinberg's direct supervisor was Yechiel Lehrfield, the Director of Accounting.

21.     Despite several requests, Ms. Weinberg never received the proper training in her position, which required knowledge of historical events and internal policies and procedures to best accomplish some of her tasks. Therefore, she had no choice but to rely on Mr. Lehrfield for direction and necessary historical data.

22.     Within just a few weeks after starting her employment, Ms. Weinberg learned she was pregnant and shortly thereafter verbally disclosed this news to Mr. Lehrfield and Karolina Bortko, the Director of Human Resources.

23.     By October 2022, Arch's discriminatory attitude towards Ms. Weinberg based on her pregnancy became clear.

24.     While Ms. Weinberg made sure to schedule most of her pregnancy-related medical appointments outside of working hours, she had no choice but to schedule a few crucial appointments during normal working hours.

25.     Arch reluctantly accommodated this; however, upper management, particularly Jason Paul, Partner of Arch, gave her constant push back and requested she move her appointments.

26.     This was often impossible because Ms. Weinberg was working around her doctors' schedules and openings for appointments.

27.     Despite being an exempt salaried employee, who regularly worked outside of normal business hours and certainly beyond 40 hours in a week, Ms. Weinberg's time was nonetheless constantly being micromanaged by upper management.

28.     One such occurrence, on Friday, October 14, 2022, a day she was contractually permitted to work from home, Ms. Weinberg attended to a doctor's appointment related to her pregnancy.

29.     For absolutely no reason, Mr. Paul demanded that Ms. Weinberg report to work in-person at Defendant's office after her appointment.

30.     In that same thread, Mr. Paul told Ms. Weinberg  to "please use the train time wisely" as she was heading into work.

31.     Ironically, because she was coming from a doctors' appointment that was closer to her home, Ms. Weinberg spent more time commuting then if she had just been permitted to work remotely, as per her contract.

32.     Despite working long hours for Arch, including outside of normal business hours, Mr. Paul's comment implied that because of her pregnancy-related medical appointments, Ms. Weinberg was not putting in sufficient hours. This was untrue.

33.     On certain days when Ms. Weinberg experienced severe morning sickness from her pregnancy causing her to be slightly late to work, she informed Mr. Lehrfield of the cause.

34.     Instead of engaging in a dialogue on how to reasonably accommodate Ms. Weinberg's pregnancy related medical conditions, Mr. Lehrfield only noted that leadership "took issue" with her occasional lateness caused by her pregnancy-related symptoms.

35.     In another instance of differential treatment based on her pregnancy, on November 8, 2022, Mr. Lehrfield reprimanded Ms. Weinberg for not sharing an invite in his calendar of her availability for the next day.

36.     Specifically, he stated, "Need to know you're not in the office" and "I'm responsible to know where my team is every day. If it's not in the office I need that in an invite."

37.     Meanwhile, Ms. Weinberg had told him just days before about her availability and reminded him the very same day.

38.     Also, in or about October 2022, Ms. Weinberg learned that Mr. Lehrfield was heavily pressing Riveredge Advisors ("REA"), a company that Arch partnered with for assistance with financial reporting, about how soon they could take on Ms. Weinberg's work.

39.     This ask was heavily premature given that Ms. Weinberg was still *five months* away from her due date and was perfectly capable of handling all her job responsibilities related to financial reporting until she went out on leave following the birth.

40.     Mr. Lehrfield had initially informed Ms. Weinberg that REA would only be handling her responsibilities, such as continuing her work on audit fieldwork, after her maternity leave began.

41.     However, Ms. Weinberg began to notice her duties were needlessly being shifted away from her to REA.

42.     Mr. Lehrfield was transitioning nearly all her workload to REA even though her work performance had not changed.

43.     On numerous occasions, it was emphasized to her that Arch was "nervous" for when she was going to be out on maternity leave.

44.     Although she was five months away from her due date, and insisted she intended to work right up until her due date, management unwarrantedly assumed Ms. Weinberg would be taking leave at least two months before the baby arrived.

45.     This assumption was patronizing and biased.

46.     Ms. Weinberg's stated intention was to continue to work until her due date.

47.     Arch's leadership also regularly questioned Ms. Weinberg on her plans for returning to work after her parental leave, even though she repeatedly told them she planned to return to work.

48.     On November 17, 2022, Arch terminated Ms. Weinberg's employment.

49.     Arch noted the reason for her termination, after nearly four months since her hiring, was that her position was made "redundant" due to the overlap between her position and REA's.

50.     Ms. Weinberg was confused as to how her role could possibly have become "redundant" given that she was hired only four months prior to replace a position that was previously filled, and that she was hired a month *after* Defendant had retained REA's services.

51.     In fact, REA employees were shocked to learn that Arch terminated Ms. Weinberg's employment because she was integral to REA's ability to perform their work for Arch.

52.     The only change was that Ms. Weinberg was pregnant and Defendant would need to transition her duties for a finite period during her maternity leave.

53.     Given these facts, her firing was clearly pretextual.

54.     Upon information and belief, after terminating Ms. Weinberg, Arch had to scramble to reallocate Ms. Weinberg's tasks to other internal employees who were wholly unqualified, including Elisabeth Mayer (Ms. Mayer), an executive assistant, who gained Ms. Weinberg's responsibilities and felt overwhelmed and set-up for failure.

55.     Ms. Mayer ultimately quit because, upon information and belief, she felt that Arch had set her up for failure by assigning her Ms. Weinberg's duties, which she felt unqualified for.

56.     Upon information and belief, and according to a pending lawsuit in New York Supreme Court between the two founding partners, Arch has a reputation for perpetuating a toxic working environment for all employees, including that one of the founding partners Simpson has a history of menacing, intimidating, and name calling others.

57.     According to the public filings in the pending litigation between the partners of Arch, Ms. Bortko, the head of HR, has commented on several occasions that she has never seen a more toxic work environment.

58.     Upon information and belief, Simpson sent out a message to key employees stating, "So everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

59.     This attitude was intensified for Ms. Weinberg who, as a pregnant women, needed certain reasonable accommodations for her pregnancy related morning sickness and other pregnancy related doctors' appointments.

60.    And, because Ms. Weinberg's pregnancy would mean she would take a 12 week parental leave, Arch had no desire to keep her employed.

61.    The discriminatory acts described above support a strong inference of a discriminatory attitude towards Ms. Weinberg as a pregnant employee and that her pregnancy was a motivating factor in Defendant's decision to terminate her position in violation of federal, state, and city anti-discrimination laws.

62.    On the day of Ms. Weinberg's termination, she was so emotionally distraught, experiencing extreme stress and anxiety, that she ended up seeking emergency medical attention because she was experiencing severe abdominal pains.

63.    Ms. Weinberg was directed to go to the hospital's labor and delivery ward with concerns of preterm labor.

64.    It has long been understood, and medically documented, that during pregnancy, stress can increase the chances of having a baby who is preterm.

65.    During ultrasounds and other tests, it was clear that both Ms. Weinberg and the baby were experiencing physical manifestations of the stress.

66.    On Ms. Weinberg's discharge papers, to hospital indicated preterm labor and gave her instruction on how to identify signs of preterm labor.

**FIRST CAUSE OF ACTION**
**Discrimination Based on Pregnancy in Violation of Title VII of the Civil Rights Act as Amended by the Pregnancy Discrimination Act**

67.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

68.    By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy in violation of Title VII by treating her differently from, and less favorably, than similarly situated employees who did not become pregnant.

69.     Ms. Weinberg was qualified for her position and was fulfilling her obligations more than satisfactorily.

70.     Upon the disclosure of her pregnancy to management, Arch's discriminatory attitudes and actions toward Ms. Weinberg, including but not limited to, micromanaging her time, reprimanding her for not being in the office during pregnancy-related doctor's appointments or illnesses, handing off her responsibilities to less capable and less qualified colleagues, and ultimately terminating her employment, became apparent.

71.     This termination came only four months after hiring her, and shortly after Ms. Weinsberg's disclosure of her pregnancy, creating an inference of discriminatory animus.

72.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer harm including in the form of lost wages and benefits and emotional distress and injury, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## SECOND CAUSE OF ACTION
### Discrimination in Violation of NYSHRL

73.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

74.     By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy in violation of the New York State Human Rights Law, Article 15, § 20, *et seq.*, ("NYSHRL") by treating her differently from, and less favorably than, similarly situated employees who did not become pregnant.

75.     Ms. Weinberg was qualified for her position and was fulfilling her obligations more than satisfactorily.

9

76.     Upon the disclosure of her pregnancy to management, Arch's discriminatory attitudes and actions toward Ms. Weinberg, including but not limited to, micromanaging her time, reprimanding her for not being in the office during pregnancy-related doctor's appointments or illnesses, handing off her responsibilities to less capable and less qualified colleagues, and ultimately terminating her employment, became apparent.

77.     This termination came only four months after hiring her, and shortly after Ms. Weinsberg's disclosure of her pregnancy, creating an inference of discriminatory animus.

78.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm including in the form of lost wages and benefits and emotional distress and injury, for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

### THIRD CAUSE OF ACTION
### Discrimination in Violation of NYCHRL

79.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

80.     By the actions described above, among others, Defendant discriminated against Plaintiff on the basis of her pregnancy in violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, § 8-107, *et. seq.* ("NYCHRL") by treating her differently from and less favorably than similarly situated employees who did not become pregnant.

81.     Ms. Weinberg was qualified for her position and was fulfilling her obligations more than satisfactorily.

82.     Upon the disclosure of her pregnancy to management, Arch's discriminatory attitudes and actions toward Ms. Weinberg, including but not limited to, micromanaging her

time, reprimanding her for not being in the office during pregnancy-related doctor's

appointments or illnesses, handing off her responsibilities to less capable and less qualified

colleagues, and ultimately terminating her employment, became apparent.

83.     This termination came only four months after hiring her, and shortly after Ms.

Weinsberg's disclosure of her pregnancy, creating an inference of discriminatory animus.

84.     As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of NYCHRL, Plaintiff has suffered and continues to suffer harm including in

the form of lost wages and benefits and emotional distress and injury, for which she is entitled to

an award of damages, to the greatest extent permitted under law, in addition to reasonable

attorneys' fees and expenses.

85.     Defendants' unlawful and discriminatory actions constitute malicious, willful, and

wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief:

a.     A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate the laws of the State of New York and the City of New York;

b.     An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages;

c.     An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

d.     An award of punitive damages in an amount to be determined at trial;

e.     Prejudgment interest on all amounts due;

f.     An award of Plaintiff's reasonable attorneys' fees and costs; and

g.     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial

by jury on all questions of fact raised by the Complaint.


Dated:    December 12, 2023
          New York, New York

Rachel Haskell
Law Office of Christopher Q. Davis
80 Broad Street, Suite 703
New York, NY 10004
646-430-7930
rhaskell@workingsolutionsnyc.com